# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued April 17, 2012         Decided August 17, 2012

No. 10-1380

GROCERY MANUFACTURERS ASSOCIATION, ET AL.,
PETITIONERS

v.

ENVIRONMENTAL PROTECTION AGENCY,
RESPONDENT

GROWTH ENERGY,
INTERVENOR

———

Consolidated with 10-1414, 11-1002, 11-1046, 11-1072,
11-1086

———

On Petitions for Review of Final Actions
of the Environmental Protection Agency

———

*Catherine E. Stetson* argued the cause for petitioners Grocery Manufacturers Association, et al. *Michael F. McBride* argued the cause for petitioners Alliance of Automobile Manufacturers, et al. With them on the briefs were *Mary Helen Wimberly*, *Richard A. Penna*, *Marisa Hecht*, *Chet M. Thompson*, *William L. Wehrum*, and *Lewis F. Powell*, *III*.

*Kenneth T. Cuccinelli, II*, Attorney General, Office of the Attorney General for the State of Virginia, *E. Duncan Getchell Jr.*, Solicitor General, *Stephen R. McCullough*, Senior Appellate Counsel, *Charles E. James Jr.*, Chief Deputy Attorney General, and *Wesley G. Russell Jr.*, Deputy Attorney General, *Luther Strange*, Attorney General, Office of the Attorney General for the State of Alabama, *E. Scott Pruitt*, Attorney General, Office of the Attorney General for the State of Oklahoma, and *John J. Burns*, Attorney General, Office of the Attorney General for the State of Alaska, were on the brief as *amici curiae* State of Alabama, et al.

*Jessica O'Donnell*, Attorney, Department of Justice, argued the cause and filed the brief for respondent.

*Randolph D. Moss* argued the cause for intervenor. With him on the brief were *Kenneth R. Meade* and *Brian M. Boynton*.

Before: SENTELLE, *Chief Judge*, TATEL and KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed by *Chief Judge* SENTELLE.

Concurring opinion filed by *Circuit Judge* TATEL.

Dissenting opinion filed by *Circuit Judge* KAVANAUGH.

SENTELLE, *Chief Judge*: Petitioners, trade associations whose members are part of the petroleum and food industries, filed petitions for review of two EPA decisions approving the introduction of E15—a blend of gasoline and 15 percent ethanol—for use in select motor vehicles and engines. Because we hold that no petitioner has standing to bring this action, we dismiss all petitions for lack of jurisdiction.

## I. The Waiver Proceeding

In the Energy Policy Act of 2005, Congress incorporated into the Clean Air Act (CAA) the Renewable Fuel Standard, Pub. L. 109-58, § 1501(a) (2005) (RFS). As amended, the RFS requires qualifying refiners and importers of gasoline or diesel fuel to introduce into U.S. commerce a specified, annually increasing volume of renewable fuel. 42 U.S.C. § 7545(o)(2)(A)(i).

In order to comply with the requirements of the RFS, refiners and importers primarily blend corn-based ethanol into the fuel supply. The national gasoline supply currently consists largely of "E10," a gasoline blended with 10 percent ethanol. Given the continual increase in required volume of renewable fuel, E10 alone will not meet the producers' obligations forever. E10 has substantially saturated the U.S. gasoline market already, yet the volume of renewable fuel required to be introduced increases annually, up to 36 billion gallons of renewable fuel in 2022. *Id.* § 7545(o)(2)(B)(i)(I). Moreover, an increasing percentage of the increasing RFS obligation must come from "advanced biofuels," *i.e.*, sources other than ethanol derived from corn. *Id.* § 7545(o)(2)(B)(i)(II) (requiring that advanced biofuel make up 21 billion of the 36 billion gallons of renewable fuel required in 2022). Fuel manufacturers must, therefore, introduce new types of renewable fuels in order to continue to meet their growing burden under the RFS.

Fuel manufacturers cannot introduce new renewable fuels into the market at will. The Clean Air Act prohibits manufacturers from introducing into commerce "any fuel or fuel additive for use by any person in motor vehicles manufactured after model year 1974 which is not substantially similar to any fuel or fuel additive" used in the federal emissions certification of those vehicles. 42 U.S.C. § 7545(f)(1)(B). To bring most

new fuels (including renewable fuels) to market, a manufacturer must apply for a waiver of this prohibition pursuant to CAA Section 211(f)(4), 42 U.S.C. § 7545(f)(4). The Administrator of EPA may grant such a waiver "if he determines that the applicant has established that such fuel or fuel additive or a specified concentration thereof, and [its] emission products …, will not cause or contribute to a failure of any emission control device or system (over the useful life of the motor vehicle, motor vehicle engine, nonroad engine or nonroad vehicle in which such device or system is used) to achieve compliance by the vehicle or engine with the emission standards with respect to which [the vehicle or engine] has been certified pursuant to sections 7525 and 7547(a) of this title." 42 U.S.C. § 7545(f)(4).

In March 2009, Growth Energy, a trade association representing the ethanol industry, applied for a Section 211(f)(4) waiver to introduce E15, an unleaded gasoline blend containing 15 percent ethanol. After notice and comment, EPA issued two separate waiver decisions. In its first waiver decision, Partial Grant and Partial Denial of Clean Air Act Waiver Application Submitted by Growth Energy To Increase the Allowable Ethanol Content of Gasoline to 15 Percent, 75 Fed. Reg. 68,094 (Nov. 4, 2010), EPA approved the introduction of E15 for use in light-duty motor vehicles from model-year 2007 and later. At the same time, it denied the waiver for model-year 2000 and older vehicles because it could not determine given the data available that using E15 in such vehicles would not contribute to failures of emissions controls. For the same reason, EPA denied the waiver for nonroad engines, vehicles, and equipment (*e.g.*, boats, all-terrain vehicles, and weedeaters), heavy-duty gasoline engines and vehicles, and motorcycles. Finally, EPA deferred its decision whether to approve E15 for use in model-year 2001–2006 light-duty motor vehicles and engines, stating that it needed further results from Department of Energy (DOE) tests that measured the effects of ethanol blends on the durability of

engine catalysts (which "scrub" motor vehicle emissions by converting harmful exhaust gases into carbon dioxide, nitrogen, and water). After receiving those results, EPA issued a second decision. Partial Grant of Clean Air Act Waiver Application Submitted by Growth Energy To Increase the Allowable Ethanol Content of Gasoline to 15 Percent, 76 Fed. Reg. 4662 (Jan. 26, 2011). That second decision extended the waiver to permit the use of E15 in light-duty motor vehicles and engines from model-years 2001–2006.

In sum, EPA granted "partial" waivers approving the introduction of E15 for use in model-year 2001 and newer light-duty motor vehicles and engines. These waivers are conditional. E15 manufacturers are required to (1) introduce only E15 that meets certain fuel quality parameters and (2) submit for approval by EPA a plan for the implementation of "misfueling mitigation conditions" set forth in the EPA decision. The term "misfueling," as used in the EPA decisions, refers to the use of E15 in pre-2001 vehicles and other non-approved vehicles, engines, and equipment. The misfueling mitigation conditions and strategies which EPA set forth as necessary for such a plan included pump-labeling requirements, participation in a pump-labeling and fuel-sample compliance survey, and proper documentation of ethanol content on transfer documents.

Three sets of industry groups (collectively, "Petitioners") representing members who either (1) manufacture engines and related products (the "engine-products group" or "engine manufacturers"), (2) sell food (including livestock) that requires corn as an input (the "food group" or "food producers"), or (3) produce or handle petroleum and renewable fuels (the "petroleum group" or "petroleum suppliers") petitioned this court for review of EPA's E15 waivers. We review herein the consolidated petitions. Growth Energy, the waiver applicant, intervened in support of EPA's defense of its waiver decisions.

## II.  Standing

Petitioners contend that (1) EPA lacks authority under CAA Section 211(f)(4) to grant "partial" waivers approving the use of E15; (2) Growth Energy, the waiver applicant, failed to meet a required evidentiary burden under Section 211(f)(4); (3) EPA failed to provide sufficient opportunity for comment on certain aspects of its waiver decision; and (4) the record does not support EPA's decision to grant the partial waivers.  While the government does not contest petitioners' standing to petition for review of EPA's waiver decisions, intervenor Growth Energy has called our attention to the potential failure of petitioners to establish standing under Article III.  Even in the absence of intervenor's objection, we would be required to review petitioners' standing.  Standing under Article III is jurisdictional.  If no petitioner has Article III standing, then this court has no jurisdiction to consider these petitions.  *See, e.g.*, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  Regardless of whether the parties raised the issue, we have "an independent obligation to be sure of our jurisdiction."  *Sierra Club v. EPA*, 292 F.3d 895, 898 (D.C. Cir. 2002).  Therefore, before we even consider the merits of the petitions, we must determine whether any petitioner has standing to bring them to court.

### A.

As the Supreme Court has declared, "the law of Art. III standing is built on . . . the idea of separation of powers."  *Allen v. Wright*, 468 U.S. 737, 752 (1984).  The application of the standing doctrine, along with other jurisdictional requirements, ensures that federal courts act only within their constitutionally prescribed role:  resolving "Cases" and "Controversies," U.S. CONST. art. III, § 2, cl. 1, "those disputes which are appropriately resolved through the judicial process," *Lujan*, 504

U.S. at 560.  *See also Fla. Audubon Soc'y v. Bentsen*, 94 F.3d 658, 663 (D.C. Cir. 1996) (en banc).  To establish Article III standing, a party must establish three constitutional minima: (1) that the party has suffered an "injury in fact," (2) that the injury is "fairly traceable" to the challenged action of the defendant, and (3) that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 560-61 (internal quotation marks, alterations, and citations omitted).

The party seeking to invoke the jurisdiction of the federal court "bears the burden of establishing these elements." *Id.* at 561.  To do so, it must "support each element of its claim to standing 'by affidavit or other evidence.'" *Sierra Club*, 292 F.3d at 899 (quoting *Lujan*, 504 U.S. at 561).  On direct review of agency action, it must provide that support in its opening brief. *Public Citizen, Inc. v. NHTSA*, 489 F.3d 1279, 1289 (D.C. Cir. 2007).  If the petitioner's standing is self-evident (as when the petitioner is the object of an administrative action), "no evidence outside the administrative record is necessary." *Sierra Club*, 292 F.3d at 900.  But when the administrative record fails to establish a substantial probability as to any element of standing, "the petitioner must supplement the record to the extent necessary to explain and substantiate its entitlement to judicial review." *Id.*

**B.**

As an initial matter, we note that each separate petitioner in this case is a trade association. Each petitions for review of EPA's waiver decisions on behalf of its members, *e.g.*, car manufacturers, petroleum refiners, and cereal distributors. This is not in itself a problem.  An association has standing to sue on its members' behalf if it can show that (1) a member "would have standing to sue in [its] own right," (2) "the interests the

association seeks to protect are germane to its purpose," and (3) "neither the claim asserted nor the relief requested requires that an individual member of the association participate in the lawsuit." *Id.* at 898. We have no reason to believe any petitioners fail to meet the latter two requirements. We therefore need consider only whether any petitioner association has demonstrated that any of its members would have standing to sue in its own right.

We need not conclude that all petitioners have standing. As all petitioners raise the same issues, if we determine that even one of the petitioners has Article III standing, we will then have established our jurisdiction to consider the merits of the petitions. *See, e.g.*, *Military Toxics Project v. EPA*, 146 F.3d 948, 954 (D.C. Cir. 1998). Standing is not self-evident for any of the entities Petitioners represent. EPA's waiver decisions do not on their face directly impose regulatory restrictions, costs, or other burdens on any of these types of entities. This, of course, makes Petitioners' task more difficult. "The Supreme Court has stated that standing is 'substantially more difficult to establish' where, as here, the parties invoking federal jurisdiction are not 'the object of the government action or inaction' they challenge." *See Public Citizen*, 489 F.3d at 1289 (quoting *Lujan*, 504 U.S. at 562.). Petitioners have to demonstrate that EPA's actions—in particular, approving E15 via partial waivers—have caused any one of their members an injury in fact for which we can provide redress in this action. Each industry group advances a theory of standing, but none is in fact adequate to meet the burden of establishing standing under Article III.

## 1. The Engine-Products Group

The engine-products group advances a convoluted theory of standing. It begins with the assertion that its members

manufacture cars, boats, and power equipment with engines not made for, certified, or warranted to use ethanol blends greater than E10. As a result of EPA's partial waivers, they assert, E15 will enter the fuel market and consumers will use it in their products. Such use, the engine manufacturers claim, "may" harm their engines and emission-control devices and systems. Pet'rs Br. at 17. This will supposedly subject the engine manufacturers to liability: consumers may bring warranty and safety-related claims against the manufacturers under state or federal law, and the government may impose a recall of some engines or vehicles.

This hypothetical chain of events fails as a showing of Article III standing. An Article III injury in fact must be "(i) 'concrete and particularized' rather than abstract or generalized, and (ii) 'actual or imminent' rather than remote, speculative, conjectural or hypothetical." *In re Navy Chaplaincy*, 534 F.3d 756, 759–60 (D.C. Cir. 2008). It must also be "substantially probable" that the challenged agency action caused that injury. *See Fla. Audubon*, 94 F.3d at 663 (citing *Kurtz v. Baker*, 829 F.2d 1133, 1144 (D.C. Cir. 1987)). The engine-products group's theory of standing meets neither of these requirements.

To begin with, the engine manufacturers provide almost no support for their assertion that E15 "may" damage the engines they have sold, subjecting them to liability. They suggest that damage may occur via two avenues. First, they contend that consumers will use E15 in the model-year 2001 and newer light-duty vehicles and engines for which it has been approved, and that E15 may harm those engines (contrary to EPA's findings). They support this assertion, however, with a single reference to internal testing by Mercedes-Benz documenting a 2 percent hit to fuel economy and "potential vehicle damage" from the use of E15 in Mercedes vehicles. This is hardly evidence of a substantial probability that E15 will cause engine harm.

Second, the engine-products group maintains that consumers will "misfuel," *i.e.*, fuel non-approved vehicles and equipment with E15, and that E15 will cause damage to and emissions failures in such engines, including boat engines and power equipment motors, for which engine manufacturers may incur liability. This convoluted theory of causation will not meet Petitioners' burden. It is well established that "[c]ausation, or 'traceability,' examines whether it is substantially probable that the challenged acts of the defendant, not of some absent third party, will cause the particularized injury of the plaintiff." *Fla. Audubon Soc'y v. Bentsen*, 94 F.3d at 663 (citing *Allen v. Wright*, 468 U.S. 737, 753 n.19 (1984)) (other citations omitted). As in *Florida Audubon*, *Allen v. Wright*, and numerous other cases cited in *Florida Audubon*, any injury to the engine-product petitioners—speculative at best—depends upon the acts of third parties not before the court. If the contemplated injury is to occur at all, it will require that consumers use the fuel in engines for which it is neither designed nor approved, suffer damages to those engines as a result, and bring successful warranty or other liability lawsuits against engine-products petitioners. These petitioners attempt to drag their claims across the causation threshold by simply listing federal laws that either impose liability for emission warranty claims, *see* 42 U.S.C. § 7541, or provide for recall of nonroad engines and vehicles that fail to meet emission standards, *id.* § 7547. This is not sufficient. That a theoretical possibility of lawsuits exists does not establish the required probability that the third parties will misfuel in the fashion posited by petitioners, then bring the lawsuits, then prevail. The last link is particularly problematic; the engine-products petitioners have failed to point to any grounds for a *meritorious* suit against them. As they admit, Pet'rs' Br. at 18, their engines are not warranted for E15, nor is it clear why manufacturers would be liable for damages from consumer-induced misfueling. As for their recall theory, they have failed to establish any probability that the government would recall

engines because third parties had misfueled. This leaves yet another weak link in their causative chain, especially given the limited circumstances in which manufacturers are generally subject to a recall, *see Chrysler Corp. v. EPA*, 631 F.2d 865, 896 (D.C. Cir. 1980).

To reiterate what we noted earlier in this discussion, "[T]he 'case or controversy' limitation of Article III still requires that a federal court act only to redress injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court." *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 41 (1976). The engine-products group has not established standing to bring these petitions.

## 2. The Petroleum Group

The petroleum group includes associations that represent refiners and importers, which produce petroleum products, as well as "downstream" entities like fuel blenders and terminals, which handle, store, or transfer those products. The petroleum group asserts that both groups suffer an injury in fact traceable to EPA's waiver decisions. It argues that EPA's partial approval of the introduction of E15 into commerce effectively forces refiners and importers to actually introduce E15 into commerce because they are obligated to meet the renewable fuel requirements of the RFS. They further assert that the downstream entities will have to accommodate this new fuel type. Both sets of entities will incur substantial costs as a result of taking on E15, including "special fuel production, transportation, and fuel segregation efforts." Pet'rs' Br. at 19. Further costs will come from the "new compliance surveys and fuel pump dispenser labeling" required by the E15 waiver decisions. *Id.* In addition, these entities will purportedly face the liability risks that come with producing a fuel that they

contend will cause damage to misfueled vehicles.

This theory fails to establish standing. We cannot fairly trace the petroleum group's asserted injuries in fact—the new costs and liabilities of introducing and dealing with E15—to the administrative action under review in this case. That action, EPA's approval of the introduction of E15 for use in certain vehicles and engines, does not force, require, or even encourage fuel manufacturers or any related entity to introduce the new fuel; it simply permits them to do so by waiving the CAA's prohibition on introducing a new fuel that is not substantially similar to the fuel used to certify vehicles and engines under their applicable emission standards, *see* 42 U.S.C. § 7545(f)(4). In short, the only real effect of EPA's partial waivers is to provide fuel manufacturers the option to introduce a new fuel, E15. To the extent the petroleum group's members implement that option voluntarily, any injury they incur as a result is a "self-inflicted harm" not fairly traceable to the challenged government conduct. *See, e.g.*, *Pub. Citizen*, 489 F.3d at 1290 (citing *Nat'l Family Planning & Reproductive Health Ass'n, Inc. v. Gonzales*, 468 F.3d 826, 831 (D.C. Cir. 2006)); *Petro-Chem Processing, Inc. v. EPA*, 866 F.2d 433, 438 (D.C. Cir. 1989).

Petitioners maintain that the new fuel choice provided by the partial waivers is no real choice at all. They stress that if EPA makes E15 an option (as it did), "refiners and importers will necessarily have to introduce E15 into commerce" to meet their volume requirements under the RFS. Even if we were to consider the refiners' and importers' decision to introduce E15 as forced rather than voluntary, it would be "forced" (under their theory) not by the availability of E15 (which is the only effect of the partial waivers) but rather by the RFS, which obliges manufacturers to introduce certain volumes of renewable fuel. In other words, if the injuries of refiners and importers are traceable to anything other than their own choice to incur them,

it is to the RFS, not to the partial waivers they challenge here.

In any event, Petitioners have not established that refiners and importers will indeed have to introduce E15 to meet their volume requirements under the RFS. The partial waivers provide obligated parties with a new option for meeting those requirements, but the RFS does not mandate that obligated parties use E15 or any other particular product to meet its requirements. In fact, as noted above, refiners and importers may only use a capped amount of corn-based ethanol to meet their RFS obligations, and they are already nearing that cap. They have provided no reason why they could not instead use a different type of fuel to meet those obligations. Of course, if that reason is cost—either the costs of research and development of fuels, or the costs of introduction of such a fuel— then their choice to instead use E15 would be a decision grounded in economics, not one forced on them by the RFS and most certainly not by the partial waivers. Moreover, Petitioners themselves indicated that there are still other options besides using E15: "The RFS includes mechanisms by which the EPA Administrator may waive the total volume of renewable fuel for any given year or waive requirements for certain renewable fuels." Pet'rs' Br. at 5 (citing 42 U.S.C. § 7545(o)(7)(A)(i)-(ii), (D), (E), (F)). While EPA may decline to waive the RFS requirements, lobbying the Administrator to do so is another option at Petitioners' disposal. In sum, Petitioners have not demonstrated that the partial E15 waivers provide refiners and importers with a Hobson's choice (introduce E15 or violate the RFS) rather than a real one, such that the costs they would sustain by introducing E15 could be considered "forced by" or traceable to the challenged agency action.

Petitioners offer a related argument centered on the downstream parties. These parties own infrastructure (*e.g.*, deepwater, barge, and pipeline terminals) that aids in the

transfer, handling, and blending of petroleum products. Pet'rs' Br. at x–xi, 19. Regardless of whether the E15 waiver can be said to "cause" petroleum refiners and importers to begin introducing E15, Petitioners suggest that they will introduce it given their RFS obligations, and downstream entities will have to expend significant resources to blend and otherwise deal with the E15 the refiners and importers choose to introduce. In this way, according to Petitioners, "EPA's partial E15 waiver therefore will require these organizations to expend enormous resources to blend and introduce E15 into the market." Pet'rs' Br. at 19.

With this argument, Petitioners again wrongly identify the actual cause of downstream entities' choice to incur the costs of handling E15. Neither the RFS nor the partial E15 waivers "require" downstream entities to have anything to do with E15. If they face any pressure to handle E15, it is likely economic in nature. Downstream parties very well might lose business if they decline to blend or otherwise deal with E15, but that makes the choice to handle E15 one they make in their own self-interest, not one forced by any particular administrative action. In this way, Petitioners' argument is much like one we rejected in *Petro-Chem Processing v. EPA*, 866 F.2d at 438. In that case, the Hazardous Waste Treatment Council (HWTC) challenged EPA regulation of hazardous waste disposal in salt domes that HWTC argued was too lax. HWTC asserted that its members who provide cleanup services or waste brokering would be "forced" to use geologic repositories (salt domes) under the lax EPA standards and their use of unsafe methods would risk greater potential liability. The court rejected this theory of standing. We pointed out that this potential liability, "insofar as it is incurred voluntarily, is not an injury that fairly can be traced to the challenged action." *Id.* (internal quotation marks omitted). The members who used salt domes could avoid the potential liability by choosing safer methods than required by

EPA. If they chose the unsafe methods because of "competitive pressures," they would presumably do so "in their own self-interest." *Id.* The resulting injury would thus be "self-inflicted, … so completely due to the [complainants'] own fault as to break the causal chain." *Id.* (internal quotation marks omitted). So too here.

All of this is to say that Petitioners' attempt to draw a causal link between the E15 waivers they challenge and the costs they would incur by introducing E15 ultimately rings hollow. If anything is "forcing" these entities to incur the costs of introducing a new fuel, it is the obligations set by the RFS, competitive pressures, or some combination thereof. EPA's partial waivers simply provide a new choice of fuel that manufacturers may produce. There is not a cause of those costs providing the petroleum group with standing.

### 3. The Food Group

The food group's members produce, market, and distribute food products that require corn. This petitioner group suggests that EPA's partial approval of E15 will increase the demand for corn, which is currently used to produce most ethanol on the market. This increased demand will, according to the food group, increase the prices their members have to pay for corn.

We need not decide here whether the food group has established Article III standing with this theory because the theory plainly fails to demonstrate prudential standing.[1] While we must find Article III standing before addressing the merits of a case, *see supra* p. 6, "it is entirely proper to consider whether there is prudential standing while leaving the question of

---

[1] Chief Judge Sentelle would hold that the food group has neither Article III nor prudential standing.

constitutional standing in doubt, as there is no mandated 'sequencing of jurisdictional issues.'" *Grand Council of Crees (of Quebec) v. FERC*, 198 F.3d 950, 954 (D.C. Cir. 2000) (quoting *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 575 (1999)).

To demonstrate prudential standing, the food group "must show that the interest it seeks to protect is arguably within the zone of interests to be protected or regulated by the statute ... in question" or by any provision "integral[ly] relat[ed]" to it. *Nat'l Petrochem. Refiners Ass'n v. EPA*, 287 F.3d 1130, 1147 (D.C. Cir. 2002) (per curiam) (internal quotation marks omitted). The food petitioners have not made such a showing. They point out only that their interests are protected by EISA, the legislation that set forth the RFS, because EISA requires EPA to review, among other things, "the impact of the use of renewable fuels on ... the price and supply of agricultural commodities ... and food prices" when EPA sets renewable fuel volume requirements in the future. 42 U.S.C. § 7545(o)(2)(B)(ii)(VI). However, the statute Petitioners challenge here is the CAA's fuel-waiver provision, Section 211(f)(4)—not EISA. Nor is EISA "integral[ly] relat[ed] to Section 211(f)(4). Both statutes may have fuel as their subject matter, and the RFS may have even incentivized Growth Energy to apply for a waiver under Section 211(f)(4). But more is required to establish an "integral relationship" between the statute a petitioner claims is protecting its interests and the statute actually in question; otherwise, "the zone-of-interests test could be 'deprive[d] ... of virtually all meaning." *Fed'n for Am. Immigration Reform, Inc. v. Reno*, 93 F.3d 897, 903 (D.C. Cir. 1996) (quoting *Air Courier Conference of Am. v. Am. Postal Workers Union*, 498 U.S. 517, 530 (1991)). Hypothetical prudential standing to challenge action under EISA does not give the food petitioners prudential standing to petition for review of action taken pursuant to CAA Section 211(f)(4).

The dissent relies on *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 132 S. Ct. 2199 (2012), but that decision neither changed the prudential-standing standard nor has any particular applicability to the facts here. The food group's interest in low corn prices is much further removed from a provision about cars and fuel than a neighboring land owner's interest is from a statute about land acquisition.

## III.  Conclusion

For the above reasons, we hold that no petitioner has standing to bring these claims. We therefore dismiss all petitions for lack of jurisdiction.

TATEL, *Circuit Judge*, concurring: I agree with the dissent that the food group has Article III standing. *See* Dissenting Op. at 4-6. I also agree with those circuits that have held that prudential standing is non-jurisdictional. *See id.* at 9-10 (collecting cases). This Circuit, however, has directly held to the contrary. *See, e.g.*, *Steffan v. Perry*, 41 F.3d 677, 697 (D.C. Cir. 1994) ("Prudential standing is of course, like Article III standing, a jurisdictional concept."); *Animal Legal Defense Fund, Inc. v. Espy*, 29 F.3d 720, 723 n.2 (D.C. Cir. 1994) ("Standing, whether constitutional or prudential, is a jurisdictional issue which cannot be waived or conceded."). True, passing statements by subsequent panels may be in some tension with these earlier decisions, *see* Dissenting Op. at 10 n.4 (collecting cases), and in recent years the Supreme Court has certainly criticized lower courts for overusing the "jurisdictional" label, *see id.* at 7-8 (collecting cases). But taken in context these cases are "too thin a reed," *id.* at 9, to permit this panel to depart from our clear prior holdings that prudential standing is jurisdictional—no matter how much we may think those decisions are wrong or that the Supreme Court may be preparing to hold otherwise. *See Rasul v. Myers*, 563 F.3d 527, 529 (D.C. Cir. 2009) ("A panel of this court . . . must adhere to the law of our circuit unless that law conflicts with a decision of the Supreme Court." (citing *LaShawn A. v. Barry*, 87 F.3d 1389 (D.C. Cir. 1996) (en banc))); *United States v. Williams*, 194 F.3d 100, 107 (D.C. Cir. 1999) (circuit precedent binding unless "eviscerat[ed]" by subsequent Supreme Court decisions), *abrogated on other grounds by Apprendi v. New Jersey*, 530 U.S. 466 (2000).

KAVANAUGH, *Circuit Judge*, dissenting: Federal law establishes a renewable fuel mandate that requires gasoline producers to introduce significant amounts of renewable fuel (such as ethanol) into the Nation's gasoline supply. To maintain statutory clean air standards, however, EPA is required to approve new fuels and fuel additives such as ethanol, and EPA may do so only when the new fuel would not cause any car models made after 1974 to violate federal emissions standards. EPA had previously approved use of E10, gasoline with up to 10% ethanol, for use in cars. But the requirement set by the statutory renewable fuel mandate could not be reached solely with E10. Ethanol manufacturers then petitioned EPA to exercise its statutory waiver authority to allow use of E15, gasoline with up to 15% ethanol. In order to issue the waiver under the statute, EPA had to find that E15 would not cause any car models made after 1974 to fail to meet emissions standards. EPA found that E15 could cause emissions failures in some cars made after 1974 (namely, in cars made between 1975 and 2000). Nonetheless, EPA still granted the waiver. For the first time ever, EPA granted what it termed a "partial waiver," meaning that the waiver allowed E15 use only in cars made after 2000.

In this suit, members of the food industry and the petroleum industry contend that EPA's E15 waiver is illegal. The food group is suing because, as a result of EPA's E15 waiver, ethanol production will increase and demand for corn (a necessary raw material for ethanol) will rise significantly. In turn, corn prices will rise. Therefore, food producers, which compete directly with ethanol producers in the upstream market for purchasing corn, will have to pay more for corn. The petroleum group is suing because, as a result of EPA's E15 waiver and the statutory renewable fuel mandate, those in the petroleum industry now must refine, sell, transport, and store E15, incurring significant costs to do so.

Despite the fact that two enormous American industries will be palpably and negatively affected by EPA's allegedly illegal E15 waiver, the majority opinion tosses the case for lack of standing. Judge Tatel and I agree that the food group has Article III standing. But the majority opinion finds that the food group is not an aggrieved party (that is, does not have prudential standing) for purposes of the Administrative Procedure Act. And the majority opinion concludes that the petroleum group's injury is not caused by EPA's E15 waiver decision and that the petroleum group thus does not have Article III standing.

This suit may proceed if *either* the food group or the petroleum group has standing. In my view, both have standing.

The food group has Article III standing because the E15 waiver, particularly in conjunction with the statutory renewable fuel mandate, will increase the prices the food group must pay for corn. And the food group's prudential standing under the APA is not contested by EPA. That matters because prudential standing (unlike Article III standing) is not jurisdictional, meaning that prudential standing has been forfeited by EPA and is thus not properly before the Court. In any event, the food group easily clears the low bar for prudential standing under the APA.

The petroleum group has Article III standing because the E15 waiver, in conjunction with the statutory renewable fuel mandate, will require some petroleum companies to refine, sell, transport, or store E15, imposing significant costs. And even if prudential standing were not forfeited, the petroleum group is a party regulated under the statutory waiver

provision; therefore, the petroleum group's prudential standing under the APA is undisputed.[1]

On the merits, I conclude that the E15 waiver violates the statute. The waiver might be good policy; if so, Congress has the power to enact a new law permitting E15. But under the statute as currently written, EPA lacks authority for the waiver. I would therefore grant the petition for review and vacate EPA's E15 waiver decision. I respectfully dissent.

I

The Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies." U.S. CONST. art. III, § 2, cl. 1. One aspect of the case or controversy requirement is standing. To sue in federal court, a plaintiff must demonstrate Article III standing, which consists of three requirements: (1) injury in fact – an invasion of a legally protected interest that is concrete and particularized, and actual or imminent; (2) causation – a fairly traceable connection between the injury and the challenged conduct; and (3) redressability – a likelihood that the injury will be redressed by a favorable decision. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). In the regulatory context, standing has not been limited to those directly regulated by an agency. Rather, under settled standing case law, those who suffer injury as a result of an agency's allegedly illegal regulation of *someone else* can still have standing, although the analysis in such cases is tricky (and frankly rather unpredictable).[2] Article III

---

[1] Because I find that either of these two groups has standing, I do not address the standing of the engine products group.

[2] When I refer to the food group and the petroleum group throughout this opinion, I am using shorthand to refer to the many such food and petroleum trade organizations and individual businesses that have sued here. *See also* Maj. Op. at 7-8 (whether

standing is jurisdictional, meaning courts must consider the issue even if the defendant or respondent does not assert that the plaintiff or petitioner lacks Article III standing.

In addition, the Administrative Procedure Act's general cause of action for challenging agency action extends only to parties "aggrieved" by the agency action. *See* 5 U.S.C. § 702. The cause of action's limitation to "aggrieved" parties is referred to (somewhat loosely and imprecisely) as prudential standing. As explained more fully below, prudential standing is not jurisdictional, meaning that it can be forfeited and need not be considered by the court if the defendant or respondent does not assert it.

A

First, I will explain why the food group has standing. For its part, EPA has not contested the food group's Article III and prudential standing. A majority of the Court – Judge Tatel and I – conclude that the food group has Article III standing. A different majority – Chief Judge Sentelle and Judge Tatel – conclude, however, that the food group lacks prudential standing to challenge EPA's E15 waiver.

The food group includes producers of processed food made with corn and those who raise livestock fed with corn. It is hard to overestimate the significance of corn to the American food industry. And petitioners' submissions to EPA and this Court reveal the following about the effects of EPA's E15 waiver on the food industry: In E10, up to 10% of gasoline is made up of ethanol. In E15, up to 15% of gasoline is made up of ethanol. That's *a 50% increase* in the amount of ethanol used. In hard numbers, with only E10 on the

trade organization has standing turns on whether any individual member has standing).

market, 14 billion gallons of ethanol could be produced each year for the Nation's gasoline supply. With E15 on the market, 21 billion gallons of ethanol can be produced each year. That's *an additional 7 billion gallons* of ethanol annually produced for use in the U.S. gasoline supply. As a result of the E15 waiver, there is likely – indeed, nearly certain in the current market – to be a significant increase in demand for corn to produce ethanol. The extra demand means that corn producers can charge a higher price. Therefore, the E15 waiver will likely cause higher corn prices, and members of the food group that depend on corn will be injured. *See generally, e.g.*, Advanced Economic Solutions, Implications for US Corn Availability Under a Higher Blending Rate for Ethanol (June 2009), J.A. 604.

This is Economics 101 and requires no elaborate chain of reasoning. It is no surprise that EPA – which is typically quite aggressive in asserting standing objections in lawsuits against it – has not contested the food group's standing in this case. The food group has standing under Article III.

Even apart from that analysis, the food group has Article III standing based on our competitor standing cases. When an agency illegally regulates an entity's competitor in a way that harms the entity – for example, by loosening regulation of the competitor – we have said that the entity has Article III standing to challenge the allegedly illegal regulation. *See, e.g.*, *Sherley v. Sebelius*, 610 F.3d 69, 72 (D.C. Cir. 2010) ("The doctrine of competitor standing addresses the first requirement [of Article III standing] by recognizing that economic actors suffer an injury in fact when agencies lift regulatory restrictions on their competitors or otherwise allow increased competition against them.") (internal quotation marks and brackets omitted); *Honeywell International Inc. v. EPA*, 374 F.3d 1363, 1369 (D.C. Cir. 2004) ("it is well

established that parties suffer cognizable injury under Article III when an agency lifts regulatory restrictions on their competitors or otherwise allows increased competition") (internal quotation marks and brackets omitted); *Louisiana Energy & Power Authority v. FERC*, 141 F.3d 364, 367 (D.C. Cir. 1998) ("We repeatedly have held that parties suffer constitutional injury in fact when agencies lift regulatory restrictions on their competitors or otherwise allow increased competition."). Here, EPA's E15 waiver loosens a prohibition on gasoline and ethanol producers and thereby harms entities such as the food group that directly compete with gasoline and ethanol producers in the upstream market for purchase of corn. *See Sherley*, 610 F.3d at 72-74 (similarly finding doctors have competitor standing after agency loosened restrictions and thereby allowed increased competition in upstream market for grants that fund research). Our competitor standing precedents thus independently support Article III standing for the food group.

A majority of the Court – Judge Tatel and I – agree that the food group has Article III standing. But Chief Judge Sentelle and Judge Tatel conclude that the food group lacks prudential standing.

Contrary to their majority opinion, I would conclude that prudential standing likewise poses no barrier for the food group. To begin with, EPA did not raise prudential standing as a defense to this lawsuit. That's critically important because prudential standing is not jurisdictional and thus can be forfeited when the defendant or respondent fails to assert it. Because EPA did not challenge the food group's prudential standing, any prudential standing objection is forfeited.

The majority opinion concludes that prudential standing is jurisdictional. *See* Maj. Op. at 15-17 (rejecting food group's claims solely on prudential standing grounds); Maj. Op. at 2, 17 (dismissing all claims, including those of food group, for lack of jurisdiction).

In my view, Supreme Court precedent makes clear, however, that prudential standing is not jurisdictional. Prudential standing concerns who may sue; it is an aspect of the cause of action that stems from the Administrative Procedure Act's limiting its cause of action to "aggrieved" parties. *See Bond v. United States*, 131 S. Ct. 2355, 2362-63 (2011); *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 97 & n.2 (1998).[3] Prudential standing is not jurisdictional because prudential standing has not been ranked by Congress as jurisdictional and is not a limitation on a court's authority to hear a case, as opposed to a limitation on who may sue to challenge a particular agency action. *See Reed Elsevier, Inc. v. Muchnick*, 130 S. Ct. 1237, 1243-44 (2010).

In recent years, the terminology of jurisdiction has been put under a microscope at the Supreme Court. And the Court has not liked what it has observed – namely, sloppy and profligate use of the term "jurisdiction" by lower courts and, at times in the past, the Supreme Court itself. These recent Supreme Court cases have significantly tightened and focused the analysis governing when a statutory requirement is jurisdictional. In *Reed Elsevier*, for example, the Court emphasized that a statutory requirement is jurisdictional when it speaks to the power of a court to hear a case rather than to

---

[3] The APA provides: "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702.

the rights of or restrictions on the parties. *Id.* at 1243; *see also Gonzalez v. Thaler*, 132 S. Ct. 641, 648 (2012) ("Recognizing our less than meticulous use of the term in the past, we have pressed a stricter distinction between truly jurisdictional rules, which govern a court's adjudicatory authority, and nonjurisdictional claim-processing rules, which do not.") (internal quotation marks omitted); *Henderson ex rel. Henderson v. Shinseki*, 131 S. Ct. 1197, 1202-03 (2011) ("We have urged that a rule should not be referred to as jurisdictional unless it governs a court's adjudicatory capacity, that is, its subject-matter or personal jurisdiction. Other rules, even if important and mandatory, we have said, should not be given the jurisdictional brand.") (citations omitted); *Bowles v. Russell*, 551 U.S. 205, 213 (2007) ("the notion of subject-matter jurisdiction obviously extends to classes of cases falling within a court's adjudicatory authority") (internal quotation marks and ellipsis omitted); *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 510 (2006) ("Jurisdiction, this Court has observed, is a word of many, too many, meanings.") (internal quotation marks omitted); *Kontrick v. Ryan*, 540 U.S. 443, 455 (2004) ("Clarity would be facilitated if courts and litigants used the label 'jurisdictional' not for claim-processing rules, but only for prescriptions delineating the classes of cases (subject-matter jurisdiction) and the persons (personal jurisdiction) falling within a court's adjudicatory authority.").

The APA cause of action – which speaks in terms of giving "aggrieved" parties a cause of action – does not address the power of the court to hear the case. Therefore, it is quite obviously not jurisdictional under the recent Supreme Court precedents.

Indeed, although the Supreme Court has not yet directly addressed whether prudential standing is jurisdictional, the

Court has suggested that it is not. In *Tenet v. Doe*, the Court noted that prudential standing is a "threshold question" that "may be resolved *before addressing jurisdiction*." 544 U.S. 1, 7 n.4 (2005) (emphasis added). While that snippet alone may be too thin a reed on which to base a definitive conclusion, it certainly is consistent with the thrust of the recent Supreme Court precedents on jurisdiction and points us further in the direction of saying that prudential standing is not jurisdictional.

Several courts of appeals have addressed the prudential standing issue in recent years – that is, since the Supreme Court's intensified focus on proper use of the term jurisdiction. And those courts likewise have determined that prudential standing is not jurisdictional. *See, e.g.*, *Board of Mississippi Levee Commissioners v. EPA*, 674 F.3d 409, 417 (5th Cir. 2012) ("Unlike constitutional standing, prudential standing arguments may be waived."); *Independent Living Center of Southern California, Inc. v. Shewry*, 543 F.3d 1050, 1065 n.17 (9th Cir. 2008) ("Unlike the Article III standing inquiry, whether ILC maintains prudential standing is not a jurisdictional limitation on our review. By failing to articulate any argument challenging ILC's prudential standing, the Director has waived that argument.") (citation and internal quotation marks omitted); *Rawoof v. Texor Petroleum Co.*, 521 F.3d 750, 756 (7th Cir. 2008) ("Prudential-standing doctrine is not jurisdictional in the sense that Article III standing is.") (internal quotation marks omitted); *Finstuen v. Crutcher*, 496 F.3d 1139, 1147 (10th Cir. 2007) ("Prudential standing is not jurisdictional in the same sense as Article III standing. . . . We could therefore decline to address this argument, as it was not raised in the court below."); *Gilda Industries, Inc. v. United States*, 446 F.3d 1271, 1280 (Fed. Cir. 2006) ("In the end, we do not need to reach or decide the question whether Gilda satisfies the standing requirements of

the Administrative Procedure Act, because the government did not contend in its brief that Gilda's complaint should be barred by the zone of interests test. The government has thus waived that argument."); *see also, e.g.*, *American Iron & Steel Institute v. OSHA*, 182 F.3d 1261, 1274 n.10 (11th Cir. 1999) ("We can pretermit the more difficult question regarding whether the Doctors' members' interests fall within the zone of interests protected by the OSH Act because prudential standing is flexible and not jurisdictional in nature.") (citations omitted).[4]

---

[4] Some older cases from this Court said that prudential standing was jurisdictional. *See, e.g.*, *Animal Legal Defense Fund, Inc. v. Espy*, 29 F.3d 720, 723 n.2 (D.C. Cir. 1994). But our more recent cases have indicated that prudential standing is not jurisdictional. *See American Chiropractic Ass'n v. Leavitt*, 431 F.3d 812, 816 (D.C. Cir. 2005) (contrasting "the less-than-demanding zone-of-interest test" with "[t]he jurisdictional question"); *Toca Producers v. FERC*, 411 F.3d 262, 265 n.* (D.C. Cir. 2005) ("the prudential standing doctrine, like the abstention doctrine, represents the sort of threshold question that may be resolved before addressing jurisdiction") (internal quotation marks and brackets omitted); *Amgen Inc. v. Smith*, 357 F.3d 103, 111 (D.C. Cir. 2004) ("That Amgen has prudential standing does not resolve this appeal, however. Another threshold issue is whether the court has jurisdiction to entertain Amgen's complaint."); *see also Oryszak v. Sullivan*, 576 F.3d 522, 527 (D.C. Cir. 2009) (Ginsburg, J., concurring) (citing *Tenet*, 544 U.S. at 6 n.4).

To the extent older cases assumed prudential standing to be jurisdictional, that assumption is no longer correct after Supreme Court cases such as *Reed Elsevier*. There, the Supreme Court expressly "encouraged federal courts" to pay better attention to the distinction between jurisdictional and non-jurisdictional statutory requirements and stated that a statutory limitation generally is jurisdictional only if it speaks to the power of the courts. 130 S. Ct. at 1243-44; *see also Gonzalez*, 132 S. Ct. at 648 ("Courts, we have

In short, respondent EPA has not raised prudential standing. EPA has thus forfeited the argument. Contrary to the weight of authority and the direction marked by the Supreme Court, the majority opinion here concludes that prudential standing is jurisdictional. *See* Maj. Op. at 2, 15-17. The majority opinion thus creates a deep and important circuit split on this important issue. In my respectful view, the Supreme Court's recent decisions on jurisdiction show that the majority opinion is incorrect on this point.[5]

---

said, should not lightly attach those drastic consequences to limits Congress has enacted.") (internal quotation marks omitted); *Kontrick*, 540 U.S. at 455 ("Clarity would be facilitated if courts and litigants used the label 'jurisdictional' not for claim-processing rules, but only for prescriptions delineating the classes of cases (subject-matter jurisdiction) and the persons (personal jurisdiction) falling within a court's adjudicatory authority.").

I certainly respect Judge Tatel's different view on the status of this Court's older precedents on this issue. But I believe our duty here is to obey the clear charge given by the Supreme Court rather than to cling to a stale slice of our precedent – precedent which not only has been undermined by subsequent Supreme Court decisions but also has not been followed by our Court in several recent cases.

[5] To be sure, intervenor Growth Energy has raised prudential standing even though EPA did not. But this Court has repeatedly held that intervenors generally may not raise arguments not raised by the parties. *See, e.g.*, *Illinois Bell Telephone Co. v. FCC*, 911 F.2d 776, 786 (D.C. Cir. 1990). There is no reason to depart from that general rule here.

Indeed, the rule preventing expansion of the case by intervenors serves important purposes, especially in our administrative law jurisprudence. The Government as defendant or respondent may want to waive or forfeit certain non-jurisdictional, non-merits threshold defenses so as to permit or obtain a ruling on the merits. In our adversary legal system, an intervenor does not and should not have the unilateral right to thwart the Government's

Even if prudential standing were jurisdictional and we therefore had to consider the issue notwithstanding EPA's failure to raise it, I would conclude that the food group has prudential standing for either of two independent reasons.

*First*, members of the food group are "aggrieved" parties. To be "aggrieved" for purposes of the APA and to have prudential standing, a party must be "arguably within the zone of interests to be protected or regulated by the statute that he says was violated." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 132 S. Ct. 2199, 2210 (2012) (internal quotation marks omitted). The Supreme Court has repeatedly emphasized that prudential standing is a low bar, writing just a few months ago: "The prudential standing test . . . is not meant to be especially demanding. . . . We do not require any indication of congressional purpose to benefit the would-be plaintiff. And we have always conspicuously included the word 'arguably' in the test to indicate that the benefit of any doubt goes to the plaintiff. The test forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Id.* (footnote, citation, and some internal quotation marks omitted).

Importantly, in "determining whether a petitioner falls within the zone of interests to be protected by a statute, we do not look at the specific provision said to have been violated in complete isolation, but rather in combination with other provisions to which it bears an integral relationship." *National Petrochemical & Refiners Ass'n v. EPA*, 287 F.3d 1130, 1147 (D.C. Cir. 2002) (internal quotation marks and brackets omitted); *see also Clarke v. Securities Industry*

ability to waive non-jurisdictional, non-merits threshold defenses to suit.

*Ass'n*, 479 U.S. 388, 401 (1987) ("In considering whether the 'zone of interest' test provides or denies standing in these cases, we first observe that the Comptroller's argument focuses too narrowly on 12 U. S. C. § 36, and does not adequately place § 36 in the overall context of the National Bank Act. As *Data Processing* demonstrates, we are not limited to considering the statute under which respondents sued, but may consider any provision that helps us to understand Congress' overall purposes in the National Bank Act.").

Here, analysis of the overall statutory scheme shows that the food group has prudential standing. The Energy Independence and Security Act of 2007 imposes a renewable fuel mandate that requires introducing increasing amounts of renewable fuel into the market every year. *See* 42 U.S.C. § 7545(*o*)(2)(B)(i)(I). The Act's renewable fuel mandate expressly commands EPA to take account of the effect on "food prices" – that is, the price of corn. 42 U.S.C. § 7545(*o*)(2)(B)(ii)(VI). The balance Congress struck in the renewable fuel mandate thus expressly incorporates effects on food prices. At the same time, another statutory provision – in the same section of the U.S. Code – requires EPA to review and approve renewable fuel additives such as ethanol to make sure the fuel complies with clean air standards. Those statutory provisions together reflect a balance among the interests of corn farmers, the petroleum industry, the food industry, and the environment, among other interests. Because the E15 waiver is necessary – at least in the current market – to effectuate the statutory renewable fuel mandate, and because the food group is explicitly within the zone of

interests for the renewable fuel mandate, the food group is in the zone of interests for purposes of this suit.[6]

That conclusion is fortified by the Supreme Court's decision just a few months ago in *Match-E-Be-Nash-She-Wish Band*, 132 S. Ct. at 2210-12. There, a residential property owner claimed that the Interior Department violated federal law – the Indian Reorganization Act – when it acquired a parcel of land *from someone else* for use by an Indian tribe as a casino. *See id.* at 2202-03. Perhaps needless to say, but the Indian Reorganization Act was not designed to benefit or regulate a property owner who objects when the Federal Government acquires *another* property owner's land in order to help Indians. The Supreme Court nonetheless concluded that prudential standing was satisfied. When the "Secretary obtains land for Indians" under this statute, "she does not do so in a vacuum. Rather, she takes title to properties with at least one eye directed toward how tribes will use those lands to support economic development." *Id.* at 2211. Although the statute in question "specifically addresses only land acquisition," decisions under the statute "are closely enough and often enough entwined with considerations of land use to make that difference immaterial." *Id.* at 2211-12. "And so neighbors to the use (like Patchak) are reasonable – indeed, predictable – challengers of the Secretary's decisions: Their interests, whether economic, environmental, or aesthetic, come within § 465's regulatory ambit." *Id.* at 2212.

---

[6] One respected commentator has summarized the Supreme Court's zone of interest precedents as follows: "An injured plaintiff has standing under the APA unless Congress intended to preclude judicial review at the behest of parties in plaintiff's class." 3 RICHARD J. PIERCE, JR., ADMINISTRATIVE LAW TREATISE § 16.9, at 1521 (5th ed. 2010). The statutes at issue here certainly do not reveal any such "intent to preclude" suits by the food group.

Here, EPA's waiver decisions were similarly made with "at least one eye" toward the renewable fuel mandate. EPA acknowledged as much when proposing the E15 waiver. *See* Notice of Receipt of a Clean Air Act Waiver Application to Increase the Allowable Ethanol Content of Gasoline to 15 Percent; Request for Comment, 74 Fed. Reg. 18,228, 18,229 (Apr. 21, 2009) ("Growth Energy maintains that under the renewable fuel program requirements of the Energy Independence and Security Act of 2007, which is now primarily satisfied by the use of ethanol in motor vehicle gasoline, there exists a 'blend barrier' or 'blendwall' by which motor vehicle gasoline in the U.S. essentially will become saturated with ethanol at the 10 volume percent level very soon. Growth Energy maintains that a necessary first step is to increase the allowable amount of ethanol in motor vehicle gasoline up to 15 percent (E15) in order to delay the blendwall. . . . Growth Energy claims that the 'blendwall' will make those renewable fuel mandates unreachable and that there are substantial environmental benefits associated with higher ethanol blends."). Because the renewable fuel mandate in turn specifically takes account of food prices, it is reasonable and predictable to think of members of the food group as proper plaintiffs to challenge these waivers. What this Court said in the decision that was affirmed in *Match-E-Be-Nash-She-Wish Band* bears repeating: "As a practical matter it would be very strange to deny Patchak standing in this case. His stake in opposing the Band's casino is intense and obvious. The zone-of-interests test weeds out litigants who lack a sufficient interest in the controversy, litigants whose interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit. Patchak is surely not in that category." *Patchak v. Salazar*, 632 F.3d 702, 707 (D.C. Cir. 2011) (citation and

internal quotation marks omitted). So too with the food group here.

*Second*, even apart from that analysis of Congress's intent in these ethanol statutes, the food group has prudential standing because it is complaining about an agency's allegedly illegal decision to loosen restrictions on a competitor of the food group – namely, the petroleum group, which competes against the food group in the upstream market for purchasing corn. Prudential standing does not prevent businesses from complaining about allegedly illegal regulation of their competitors. On the contrary, that has been the precise scenario in several Supreme Court cases where the Court found prudential standing. *See, e.g.*, *Clarke*, 479 U.S. at 403 ("competitors who allege an injury that implicates the policies of the National Bank Act are very reasonable candidates to seek review of the Comptroller's rulings"); *Ass'n of Data Processing Service Organizations, Inc. v. Camp*, 397 U.S. 150, 153-56 (1970) (sellers of data processing service have prudential standing to challenge decision allowing bank to compete in offering those services). Our cases reveal that business competitors in upstream as well as downstream markets have prudential standing. *See, e.g.*, *Sherley*, 610 F.3d at 75 ("We conclude the Doctors have prudential standing. The Dickey-Wicker Amendment clearly limits the funding of research involving human embryos. Because the Act can plausibly be interpreted to limit research involving ESCs, the Doctors' interest in preventing the NIH from funding such research is not inconsistent with the purposes of the Amendment. . . . [T]hat is all that matters."). Here, the food group directly competes with gasoline and ethanol producers in the upstream market for purchasing corn as a raw material. Based on those competitor standing precedents as well, the food group has prudential standing.

B

In the alternative, even if the food group does not have standing, the petroleum group does. The petroleum group consists of companies that produce, refine, transport, and store gasoline, ethanol, and gasoline-ethanol blends. Under the statutory renewable fuel mandate, petroleum companies are forced to introduce a significant amount of renewable fuel into the Nation's gasoline supply. Using only E10 (gasoline with up to 10% ethanol), the petroleum group companies could not meet the statutory renewable fuel mandate. As a result of the E15 waiver in conjunction with the renewable fuel mandate, however, members of the petroleum group now may – and as a factual matter, *must* – use E15 (gasoline with up to 15% ethanol) in order to meet the renewable fuel mandate. Those businesses will incur considerable economic costs to modify their production, refining, transportation, and storage methods. Those costs are clearly injuries for purposes of standing. The only question here is whether those injuries are caused by EPA's E15 waiver.

EPA has not challenged the petroleum group's Article III or prudential standing. Again, I find that silence a telling indicator that the petroleum group has standing. Moreover, the majority opinion does not dispute that the petroleum group has prudential standing. But according to the majority opinion, the petroleum group has not satisfied the causation prong of Article III standing. The majority opinion holds that the petroleum group's injury is self-imposed and not caused by EPA's E15 waiver. I disagree.

Causation requires injury that is "fairly traceable to the defendant's allegedly unlawful conduct." *Allen v. Wright*, 468 U.S. 737, 751 (1984). It is of course true that causation can be defeated by voluntary action – purely self-inflicted

injury is not fairly traceable to the actions of another. *See Petro-Chem Processing, Inc. v. EPA*, 866 F.2d 433, 438 (D.C. Cir. 1989). But causation "is not defeated merely because the plaintiff has in some sense contributed to his own injury"; causation "is defeated only if it is concluded that the injury is so completely due to the plaintiff's own fault as to break the causal chain." 13A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 3531.5 (3d ed. 2008).

To show causation, the petroleum group must demonstrate a "substantial probability" that the E15 will cause at least one of its members to incur higher costs. *Sierra Club v. EPA*, 292 F.3d 895, 899 (D.C. Cir. 2002). To be sure, the E15 waiver *alone* does not require the petroleum group to use E15, make changes, and incur costs. But we cannot consider the E15 waiver in some kind of isolation chamber. The Energy Independence and Security Act imposes a renewable fuel mandate that requires a certain amount of renewable fuel to be introduced into the market every year. Pursuant to that law, an increasing amount of renewable fuel such as ethanol – rising to 36 billion gallons in 2022 – must be introduced into the market. 42 U.S.C. § 7545(*o*)(2)(B)(i)(I). EPA regulations identify petroleum refiners and importers who produce gasoline as "obligated" parties – they are responsible for introducing a percentage of the required amount into the market each year. 40 C.F.R. § 80.1406; *see also* 40 C.F.R. §§ 80.1407, 80.1427.

Before the E15 waiver, however, petroleum producers likely could not meet the requirement set by the statutory renewable fuel mandate. Now that EPA has allowed E15 onto the market, producers likely can meet the renewable fuel mandate – but they *must* produce E15 in order to do so. So the combination of the renewable fuel mandate *and* the E15 waiver will force gasoline producers to produce E15. In tort

law, when two acts combine to create an injury, both acts are considered causes of the injury. So it is here. In the current market, there is at least a "substantial probability" that, in the wake of the E15 waiver, gasoline producers will have to use E15 in order to meet the renewable fuel mandate. And that's all that the petroleum group needs to show to carry its burden on the causation issue.

Put another way, the renewable fuel mandate directly regulates gasoline producers and requires them to introduce a certain amount of ethanol. But there was an impediment preventing the producers from meeting that mandate. The E15 waiver removed the impediment, meaning that gasoline producers now will have to use E15 to meet the mandate's requirements. On those facts, the petroleum group's injury is not self-imposed, but is directly caused by the agency action under review in this case. For those reasons, the petroleum group has Article III standing to challenge the E15 waiver provision.

The majority opinion concludes otherwise. But the fundamental flaw in the majority opinion's reasoning is its belief that petroleum producers could meet the renewable fuel mandate without using E15. In the current market, the majority opinion's assumption is simply incorrect as a matter of fact.

One way to answer the causation question in this case is to ask the following: In the real world, does the petroleum industry have a realistic choice not to use E15 and still meet the statutory renewable fuel mandate? The answer is no, and

intervenor Growth Energy's claim to the contrary seems rooted in fantasy.[7]

As to prudential standing for the petroleum group, EPA does not raise the issue, meaning again that it's forfeited. In any event, the majority opinion itself does not dispute that the petroleum group is in the zone of interests and has prudential standing. Petroleum producers are directly regulated parties. And parties directly regulated by a statute are within that statute's zone of interest. Thus, it is undisputed and indisputable that the petroleum group has prudential standing.

## II

Having found that there is standing, I turn to the merits of this case. The merits are not close. In granting the E15 partial waiver, EPA ran roughshod over the relevant statutory limits.

Section 211(f)(1) of the Clean Air Act prohibits manufacturers of fuel or fuel additives from introducing new fuels or fuel additives into commerce for use in car models made after 1974, unless the new fuel or fuel additive is "substantially similar" to certain fuels or fuel additives already in use. 42 U.S.C. § 7545(f)(1)(B). All agree that E15

---

[7] Under the majority opinion's approach, it appears that a citizen who breathes air (or at least a citizen who has breathing problems) would have standing to challenge the E15 waiver. That's because the E15 waiver will cause emissions that will negatively affect air quality. There is of course no such petitioner involved in this suit. But standing law protects economic interests as well as health interests. And the economic interests of the food and petroleum groups are palpably and significantly affected by the E15 waiver, just as are the health interests of citizens with breathing issues.

is not substantially similar to fuels already in use. But Section 211(f)(4) allows EPA to waive that prohibition if EPA "determines that the applicant has established that such fuel or fuel additive or a specified concentration thereof, and the emission products of such fuel or fuel additive or specified concentration thereof, will not cause or contribute to a failure of *any* emission control device or system (over the useful life of the motor vehicle, motor vehicle engine, nonroad engine or nonroad vehicle in which such device or system is used) to achieve compliance by the vehicle or engine with the emission standards with respect to which it has been certified." 42 U.S.C. § 7545(f)(4) (emphasis added). Put in plain English, in order to approve a waiver, EPA must find that the proposed new fuel will not cause any car model made after 1974 to fail emissions standards.

Here, EPA issued a waiver for E15 even though it acknowledged that E15 likely would contribute to the failure of some cars made after 1974 (namely, those made between 1975 and 2000) to achieve compliance with emissions standards. EPA maintains that E15 will not contribute to the failure of emissions control systems in cars built in 2001 and later. But EPA concedes that E15 likely *will* contribute to the failure of emissions control systems in some cars built before 2001.

EPA's E15 waiver thus plainly runs afoul of the statutory text. EPA's disregard of the statutory text is open and notorious – and not much more needs to be said.

EPA does throw out a few arguments to try to get around the text of the statute. None is persuasive.

First, EPA tries to weave ambiguity out of clarity in the statutory text. EPA contends that the statute does not expressly address partial waivers. But as petitioners aptly

respond in their brief, to suggest "'that *Chevron* step two is implicated any time a statute does not expressly *negate* the existence of a claimed administrative power (*i.e.*, when the statute is not written in 'thou shalt not' terms), is both flatly unfaithful to the principles of administrative law, and refuted by precedent.'" Petitioners' Reply Br. 8-9 (quoting *API v. EPA*, 52 F.3d 1113, 1120 (D.C. Cir. 1995)). There is no plausible way to read this statute as allowing partial waivers of the kind granted by EPA here.

EPA also suggests that a plain text reading of the statute would be absurd – "[c]learly Congress did not mean to require testing of every vehicle or engine." EPA Br. 23. But that argument confuses methods with standards. As to *methods*, the statute may allow EPA to test a reasonable sample of vehicles and extrapolate from those results to conclude that a new fuel will not cause any vehicles to fail their emissions tests. But the *standard* remains that a new fuel cannot cause any vehicles to fail their emissions tests. Just because EPA can restrict its testing to a reasonable sample does not mean that EPA can restrict its waivers to a subset.

EPA then invokes the purpose and legislative history of the waiver statute. With respect to purpose, there is no single purpose to this statute. Like many statutes, this one represents a complex balancing of competing interests and a slew of compromises. Congress did not pursue one purpose at all costs. *Cf. Freeman v. Quicken Loans, Inc.*, 132 S. Ct. 2034, 2044 (2012) ("No legislation pursues its purposes at all costs") (citation and brackets omitted). Courts respect the legislative process – and the myriad of interests reflected in complex legislation – by hewing to the statutory text and not trying to cherry-pick one purpose from a multitude of overlapping and sometimes conflicting congressional purposes. As to the legislative history, to the extent it's

relevant, nothing in it suggests that Congress intended to allow partial waivers. In any event, as the Supreme Court has repeatedly reminded us, the text of the statute controls. *See, e.g.*, *Mohamad v. Palestinian Authority*, 132 S. Ct. 1702, 1709-11 (2012); *Milner v. Department of the Navy*, 131 S. Ct. 1259, 1266-67 (2011). And the text here is straightforward and clear.

EPA separately claims that it has traditionally interpreted the statute as allowing conditional waivers, and that this partial waiver is like a conditional waiver. Even if the statute allows conditional waivers, conditional waivers are not the same as partial waivers. Conditional waivers generally attach conditions to the *fuel*, but such waivers do not attach limitations on the kind of vehicles that can use that fuel, which is the nature of the waiver at issue here and is precisely what the statute does not permit.

If Congress wanted to authorize this kind of partial waiver, it could easily have said so (and going forward, could still easily do so). After all, the statute elsewhere allows EPA to partially waive other statutory requirements. *See, e.g.*, 42 U.S.C. § 7545(k)(2)(A) (Administrator may "adjust (or waive entirely)" certain emissions requirements); 42 U.S.C. § 7545(m)(3)(A) (Administrator shall "waive, in whole or in part," oxygenated gasoline requirements that would prevent or interfere with the attainment of certain air quality standards); 42 U.S.C. § 7545(*o*)(7)(A) (Administrator may waive "in whole or in part" requirements of renewable fuel mandate). But Congress didn't authorize partial waivers in the waiver provision involved in this case.

* * *

The food group petitioners and the petroleum group petitioners each independently have standing to challenge

EPA's E15 waiver.  On the merits, EPA's E15 waiver is flatly contrary to the plain text of the statute.  I would grant the petition for review and vacate EPA's E15 waiver decision.  I respectfully dissent.